The next case is Medley v. Dish Network, LLC. Mr. Levengood? Yes, Your Honors. May it please the Court. I've asked to reserve four minutes for rebuttal. Your Honor, my name is Ian Levengood, and I represent the appellant in this case, the debtor, Ms. Linda Medley, who essentially is here after having filed a bankruptcy petition in the Middle District of Florida, and based upon conduct engaged in by the appellee, endured debt collection after the discharge of her bankruptcy, after the filing of her bankruptcy         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. of the District Court's ruling was that essentially because Ms. Medley has scheduled this DHA agreement, the agreement for satellite services in Schedule F as an unsecured creditor with an estimated amount due for the satellite services to DISH rather than in Schedule G, which was the executory contract schedule of the bankruptcy petitions. That misschedule, excuse me, essentially rendered a portion of this debt non-dischargeable, and so therefore any collections or any debts that were purportedly accrued after the discharge of Ms. Medley's bankruptcy was somehow a legitimate debt capable of contingent collection by DISH from that point forward. I would offer... How much was, what was the amount of that debt? Well that's in dispute. The amount that was scheduled, Your Honor, by Ms. Medley was $831.40, I believe, or $0.41. That's all been discharged, right? That's in the schedules, right. So that was the amount that was scheduled in Schedule F, and that amount, importantly, Your Honor, is an amount that was received by an intersection of a couple different events. One, looking at the actual contract itself, it contemplates a 24-month service period, and so since she had made not one but two calls to DISH prior to the filing of a bankruptcy intimating a desire and or a need to cancel because of financial hardship, in her affidavit and testimony, she was told, well, by doing that, you're going to have early termination fees, cancellation fees, other fees under the contracts that she would not be able to afford and pay on that call. And that amount was, again, approximately $830, which deals with the pre-termination and cancellation fees of the contract. Interestingly, however, if you look at the record, the statements that were sent to Ms. Medley during the pendency of the bankruptcy, so after the bankruptcy is filed, the debt is scheduled in Schedule F, and the amount that we just talked about, based upon the services we just talked about, the very first statement that she receives during the pendency of the bankruptcy does not show a balance due from DISH, but instead shows a credit balance, i.e., an amount of money that DISH purportedly owes Medley because of some credit that she had received on the bill beforehand. So, again, when you look at this contextually, this happens all the time in the consumer debtor world, where when you have a debtor that has a contract with a service provider, whether cable TV, utilities, cell phone, and they're breaking an agreement because they can no longer afford it, they schedule these creditors to make sure they get notice in the bankruptcy, and they try to estimate what the obligation is under the contract, putting them on notice that they're discharging the debt and that they no longer desire the services. The district court essentially took the position, notwithstanding Medley listing it as an unsecured creditor, and importantly and interestingly enough, DISH also in two different times in the record below, in the competing summary judgments, taking the position that it was an unsecured creditor, not an executory contract in their response and opposition to summary judgment, and also in a separate filing, in a motion in Limine, this case we thought was going to trial because we hadn't had a ruling on either of the judgments, there's a separate motion in Limine where DISH also took the position that, again, this was not an executory contract and they were trying to get an order from the court making sure that we did not Interestingly, this all came about because in the alternative, DISH argued that there's really two ways when you list a creditor in a bankruptcy that a financial obligation comes through on the other side. A, if you reaffirm a debt, you have a car, you have a mortgage, you have a pre-petition contract, there's an obligation that's due, it's liquidated on the date of the bankruptcy filing, that debt is discharged unless you reaffirm the debt or, in the case of an executory contract, unless it's assumed. Those are the two ways that a pre-petition debt can survive and go through a bankruptcy. I guess three, absent fraud, but there's really been no allegation or evidence of fraud here. Those are the two ways that the debt consensually goes through. Neither happened. It was listed in Schedule F. Excuse me, is it your position that this agreement was executory or not? We listed it, Your Honor, as an unsecured debt in Schedule F and it was not an executory contract. I will make a comment on that if I may. Every unsecured debt, especially when you're talking about a large financial institution or a service provider like Dish Network or Capital One or Wells Fargo, every unsecured debt is born an executory contract. Credit card agreement, you have obligations on both sides, payment obligations, miles that you can accrue, when payment has to be done, so they're all born an executory contract, but when in a case like this, someone makes not one but two communications to them indicating I can no longer afford this debt and I have to cancel it, I have to breach it, and I'm filing bankruptcy, I'm going to be filing bankruptcy, follows through on that communication and then lists the creditor in the bankruptcy schedules, not in G, which I would offer is an objective manifestation of how the debtor is treating it. If they thought that this was a contract that had value, if they thought it was a contract that they wanted to keep like a car lease, for example, you'd list it in G. It's listed in F here, and it makes complete sense against the contextual backdrop of how Ms. Medley was communicating with Dish, I can't afford it, I can't afford it again, I'm filing for bankruptcy, and she's scheduled it in Schedule F in an amount that contemplates the early termination fees under the DHA agreement. So we listed it as an unsecured debt. I believe it's an unsecured debt. I don't believe that the contract, there were still continuing obligations on both parties' parts, and that's why it was listed as such. But hypothetically, even if it were to be an executory contract, that is an endeavor and analysis that does not change the result. We've gone through in the briefs and explained in both circumstances, whether you have an unsecured creditor or you have an executory contract, both of those are claims under the Bankruptcy Code, 11 U.S.C. 101, I believe it is, Section 5, that talks about whether it's liquidated, unliquidated, contingent, or it's been reduced to a number or not. All of those types of claims are essentially under the contract, liquidated as a debt against the estate on the date of the petition, and that is a claim that the, whether it's the other party, the non-debtor party to the contract or the creditor, has against the estate. So, in either circumstance, the analysis really doesn't change the end result of what the creditor, in this case, Dish, would have against Ms. Medley, which is an unsecured claim in the debtor's bankruptcy estate. What do you say is the current status of the contract? Well, I mean, we're here arguing, I thought that this debt was discharged as soon as she received her discharge. I mean, importantly, I think the Bankruptcy Court is the court that is given the jurisdiction for determining dischargeability of debt. Debt was included in the schedules. Dish undisputedly received notice. If you look at the bankruptcy docket, there was no objection to how the debt was scheduled. There's no adversary proceeding filed claiming that somehow that a debt or a portion of this debt should be accepted from discharge. The discharge was entered. The debt is discharged. There is no contract. There is no obligation that Ms. Medley has to pay to Dish Network under the DHA agreement for those very reasons. If there's no contract, does that mean that the, whatever agreement she made to be, to consent to be contacted, is that, was that discharged along with the debt? Or is your argument that the contacts from counsel are what eliminated Dish's opportunity to contact her via cell phone? Three things. One, notice of the bankruptcy. You've got 11 U.S.C. section 362 when they received the notice of commencement. That's a stay of creditors. That stops all debt collection communications, whether it's through an ATDS, an auto dialer, a prerecorded voice, or mail. Ten-digit dialing. All of those types of communications are, must cease on receipt of the automatic stay. The notice of commencement also let Dish know that Ms. Medley, in this case, was not pro se but had an attorney, my firm, and so that also implicates Florida Statutes 559.72 sub 18, which says if you know that a consumer has an attorney with respect to a debt, communications directly with the debtor must stop and they must go to the attorney, period. So I do think it's both the Bankruptcy Code and the FCCPA that are both two consumer statutes, both of which are hyper-focused on regulating the collection of consumer debt that stops the conduct that was present in this case. From the very moment they received notice of an attorney, from the very moment they received notice of a bankruptcy, debt collection communications to Medley should cease and come to us. Is that your argument for the evidence that Dish knew that they were attempting to collect afterwards under the pause period? Is that your evidence? It's the first seeds of the evidence, Your Honor. The notice of commencement, which was alleged in the complaint, and it said that there were communications, both telephone calls and letters, after the notice of commencement. That's the first seed. It's not the only seed. And what are the other seeds? Discharge order. The CCPA. The discharge. So you've got the notice of commencement and the bankruptcy, the automatic stay. You have the discharge order, 11 U.S.C. section 727 and 524 discharges the debt. It liquidates the claim and discharges the debt, and 524 is a permanent injunction that prohibits any further debt collection on that account on a go-forward basis. The last thing is, not one, not two, but three times after the discharge, my firm sent faxes of representation to them, further advising them of representation and asking communications to cease. My time is up. Does that support the FCCPA claim, or does that support the TCPA claim? The calls where your office said, we represent her. I'm trying to understand how those two, those fax interact with TCPA and FCCPA, if they do. The faxes of representation? Yes. So when an attorney sends a fax of representation to a creditor and says, hey, I represent this person, provides the account number, provides the full social security number, and says that we want the communications with the debtor to cease, we want the communications to come to our office, and by the way, stop calling them with an auto dialer or an APV, it implicates both statutes. The statute says you can't communicate with her, you've got to communicate with us, that's the FCCPA, and it also says you can't use an auto dialer, that's the TCPA, but I would offer to you the FCCPA, the notice of representation of counsel. There is, in my estimation, a revocation by operation of law for the ability to continue to communicate with a consumer. Let's presume, for argument's sake, you did have prior express consent and it was solid and you had the ability to use the technology to call this debtor, well, once that person that has the consent is told you have an attorney and stop communicating with my client regarding the debt, period, it necessarily involves that consent and it revokes that consent. They can call me, they don't get to call the debtor. If our presiding judge doesn't mind, I have one question, I just want one number. How much money do you say DISH is trying to collect right now from your client? Right now, zero. Subsequent, during different times in this case, it's ranged from $5 up to $140 and then at some point in time the litigation ensued and I think it was reduced out, but there was a systemic amount of collection under the contract on a monthly basis that continued to accrue up and that's part of the problem when you have a debtor that's filed a bankruptcy and is seeking a fresh start and then all of a sudden during the pendency of the case and after the discharge of the case, the invoices just continue to come. They continue to escalate and that literally is robbing them of the fresh start that they sought in the first place. Thank you, Your Honors. You'll get your full time for rebuttal, Mr. Levengood. Thank you. Your Honors, my name is Eric Zalit. I represent the Appellee DISH Network. This is my co-counsel, David Kruger. The District Court recognized that businesses should be able to contact their customers about their accounts if they consented to be contacted. It recognized that one party to a binding contract can't unilaterally modify that contract. It recognized that creditors and a bankruptcy trustee should be able to rely on the sworn statements in a filed petition with the Federal Bankruptcy Court and we think we got, the District Court got those notions, those bedrock principles right. It's important to remember here, Your Honors, that this is not an invasive telemarketing case about hundreds of calls. It's about six calls that DISH Network made to an existing customer, Mrs. Medley, about her account. And what happened prior to the bankruptcy is Mrs. Medley in March of 2014 called in and elected a different contractual provision under which her account would be governed, the DISH pause function. And what that did was pause her account for nine months at a $5.35 a month charge and then it would reinstate the account after those nine months. Her contract lived on through the DISH pause. On April 18th, 2014, she did call into DISH and she said, I'm having some problems. I may declare bankruptcy. The termination fee was discussed and then the call somehow got disconnected. There was no closure to that call. And to be clear, Your Honors, in this record at Document 52, both parties stipulated, and I'm quoting from that stipulation, plaintiff, however, could not afford to pay the early termination fee provided for under the DHA agreement and therefore did not immediately cancel her service. So her service lived on and therefore, commensurately, her DISH contract lived on. She was afforded the opportunity and the convenience to remain a DISH customer subject to her ability to pay for the services. She kept DISH's equipment and even on that call gave DISH a brand new cell phone number at which to contact her. Every manifestation that this contract would live on. And it's not in the record anywhere that she ever canceled her services or her contract. Your Honors, DISH cannot read its customers' minds. DISH can't cancel the service of its customers by guessing what they mean when they don't say or write, cancel my contract. What about after the bankruptcy? Pardon me, Your Honor? What about after the bankruptcy? DISH had notice of the bankruptcy, correct? Yeah, DISH received notice of the bankruptcy and Your Honor, DISH did exactly what it was supposed to do. There was an amount of $831.65 listed. It was listed on Schedule F, unsecured creditors. And there was no explanation there. It didn't say termination fee, it didn't say for the DHA contract, it was just a number. On Schedule G, which deals with executory contracts like the DISH DHA agreement, she didn't list that contract anywhere. And she also affirmatively took the step of X-ing in the box under Schedule G and stating affirmatively while represented by counsel and under penalties of perjury that there are no executory contracts. And as we mentioned, Your Honor. Your opponent's argument, if I understand it, is that the fact that she didn't list it on Schedule G indicates that she did not want to continue the service and she wanted to cancel it, terminate it. What's your response to that argument? Two things. Number one, it was an executory contract. There were obligations by both parties. Did you take the position earlier in litigation that it was not an executory contract? Well, we took alternative positions, Your Honor. That's correct. We did, but we said if it's a non-executory contract, those obligations survive anyway. If it is an executory contract, then it wasn't listed and therefore, it was not rejected by the trustee. The district court adopted our alternate argument and we think it's a reasoned and accurate adaptation of that argument. The contract survived because there's ongoing obligations for both parties. I'm not sure you've answered my question though. Did the fact that she didn't list it on Schedule G but instead listed it on Schedule F indicate that she did not want to continue the contract post-bankruptcy? No. To us, the statutes require actual knowledge. The actual knowledge we had was that she wanted to continue, that she had filed a petition in bankruptcy and we did exactly what we were supposed to do, discharged everything pre-petition, but that she wanted that contract to live on. She did not list that contract. In the cases we cited in our briefs, the Zerlinga case and others state that if a contract is not listed, then it can't be accepted or rejected. So no, we- In Zerlinga, was the contract listed anywhere? Isn't that an important difference? No, Zerlinga, the contract wasn't listed and it wasn't listed here either. We think the contract has to be listed for the bankruptcy court to, the bankruptcy trustee to reject it and it wasn't listed here. Here, it was listed in Schedule G or Schedule F. I'm getting them mixed up, but it was listed whereas there was no evidence of the contract in Zerlinga, right? I beg to differ, Your Honor. The contract itself was not listed anywhere on Mrs. Medley's sworn petitions. In Schedule F, Dish was listed as an unsecured creditor with an amount of $831, but the contract itself was not listed. There's no evidence in the record of how that number ever materialized. There's no evidence that that number was ever conveyed by Mrs. Medley to Dish or by Dish to Mrs. Medley. That number, the explanation for that number first occurred in the briefing in this case. We don't believe that contract was ever listed. We got to take the sworn filed court filings for what they say or what they don't say and they don't list that contract. The problem is Zerlinga is very different from this case because there was an intentional misrepresentation in Zerlinga and there clearly was not an intentional misrepresentation because this was listed. I might point out to you, Zerlinga says a trustee cannot be deemed to have rejected a contract which he was not aware of and which was not listed in the debtor's schedule. Well, it was in the schedule. It may have been in the wrong one, but it was in the schedule. So I don't see any effort here on the debtor's part to try to cover this up or hide it. It's clear that the trustee has a duty to investigate what the assets are and this would have been one of those contracts and once the trustee doesn't assume an executory contract is discharged. Isn't that the law? Let me start at the beginning, Your Honor, on your question about intent. We believe there was intent not to list this contract. Was it nefarious intent? No, but there was a clear space for this contract to be listed. It was executory and it was X'd in affirmatively by Mrs. Medley while represented by counsel. So we don't believe Zerlinga requires any kind of devious intent, but we believe that was an intentional act and it wasn't disclosed. And your second part of your question? The second question has to do with the bankruptcy law, the duty of the trustee to investigate the assets, the estate of the debtor and decide whether to accept or reject and if it's not accepted within a relevant time period, then that contract is rejected, being rejected and therefore discharged. Am I wrong about this? We believe, no, that the trustee does have a duty to take action, reject or affirm contracts that are listed, but again, this contract was not listed. There was a debt, but the contract itself was not listed. The trustee would not be aware of that contract to accept or reject it. And by the way, this was a no-asset case, so there was really nothing Dish could have done either in the petition that was filed and that Dish received. The petition papers say, please do not file a proof of claim unless you receive notice to do so. So there was no action really that Dish could even take. The contract itself was enlisted and we believe the contract was executory, so it lived on. And so Dish, I'm going to turn to the statutory counts. It's undisputed that Dish did not attempt to collect any payments or post-discharge, I mean for pre-discharge debt. Dish did exactly what it was supposed to do. It canceled the old debt. The contacts that Dish had with Mrs. Medley were for amounts that accrued after the discharge. Is Dish still seeking money from Mrs. Medley for this debt? To answer your question, and you asked Appellant's Counsel earlier, the amount that was at issue at the end of her account, and her account lives on. She's never canceled it. She owed $42 in February of 2015 and Dish wrote that off as bad debt, as uncollectible debt. Did someone just turn the service back on for her and then cancel it? Is that what happened? Yeah, what happened was the pause feature expired, Your Honor, after her bankruptcy, a couple months after. And so the normal Dish service would resume, so that's the difference between $5 a month and $42 a month. She did not pay that $42 a month, and Dish, it's normal practice, it disconnected the service. She had a debt of $42, and Dish eventually wrote that $42 off. How do you distinguish this matter of provider meds, in which none of the debtors listed a license agreement on any of their schedules, and yet the court still found that that could be discharged because of the trustee's duty to? Your Honor, we think in providers' meds, they're similar in many ways, I agree, but in that case, the court brought specific attention to the fact that the contracts at issue were filed as a matter of public record with the patent office. This contract was not on file anywhere as a matter of public record. There's no way the trustee could have been aware of it unless it was actually listed in Schedule G. In this particular situation, it's like the bankruptcy trustee had to go find this at the patent office, but the fact that this was listed on the long schedule, that makes it more remote and less likely that the trustee, is that what you're telling me? We believe that definitely distinguishes that case, Your Honor, and it's pretty easy these days to go under the public record. I don't think you need to physically go down to the patent office, so this contract clearly was not a matter of public record. Service providers like DISH always have contracts. I mean, that's common knowledge, isn't it? It doesn't seem to me this would be such a foreign idea to the trustee that the trustee wouldn't think to look for a service contract. Again, we can't read people's minds. I don't know, Your Honor, that service providers always have contracts. I mean, I see TV commercials for service providers that proclaim they have no contracts. So I think the trustee is entitled to rely on the sworn statements under penalties of perjury while represented by counsel of a doubter that say there are no executory contracts. Let me ask you about the revocation of consent. We have our Osorio case that says that Congress sought to incorporate into the TCPA common law concepts of consent, which is normally revocable, and Osorio said, quote, in the absence of any contractual restriction to the contrary. Was there such a contractual restriction here? So Osorio was a gratuitous consent situation. Osorio was an application for a State Farm credit card. Here there was a bargain for contract, so that's a differentiating point as to Osorio. Here, what Osorio said, and I think we're saying the same thing, Your Honor, is that consent can be freely revoked if there is not a contractual restriction on that consent. Right, so that's what I want to focus on, whether there was a contractual restriction. Here there clearly was a contract that gave consent, but I didn't see any provision that says the consent couldn't be revoked. Our position, Your Honor, is that kind of flips common law contract on its head. Under the common law, in a bound, signed, mutually binding contract, that contract cannot be unilaterally revoked. I believe what Osorio said was, in a gratuitous situation, it can't be revoked unless there's a contractual provision. So what we believe is here there was a contractual provision for consent, and it was signed, and it's binding. So it's not that contractual terms can be unilaterally modified unless there's a provision that says they cannot. It is that there's no unilateral modifications unless the contract expressly allows it, and that's what the contractual restriction is in this case. It's the consent provision signed by Mrs. Medley in a mutually binding contract. We don't believe she can unilaterally revoke it under the common law. Let's say that we . . . But when you cut off the coverage, that would, at that point, she could reject. Is that correct, under your common law theory? When you cut off the service, and so we no longer have you or Dish providing the service under the contract, which is a duty, doesn't that end this common law theory of lack of consent or revoking consent? No, we think those consent provisions survive. Her obligations under the contract survive, and obligations as to paying what she owes, and obligations that she signed for that course through the contract, Your Honor. That was my question. How long, in your view, do those obligations survive? We believe the obligations that she signed for . . . It's a 24-month contract, right? So it was a nine-month pause. Then you tack on what was left in the contract. They survived to the termination date of that contract, so that probably would have been into sometime 2015 or 2016. And neither her breach nor Dish's decision to cut off service eliminates that consent? Yes. We believe that's clear under the law. If someone stops paying, they're still bound by the provisions in the contract that they signed. One more question. What's your view of the legal point that if an attorney has taken over the representation of this person, can that get around the consent that the person normally gave? No, Your Honor, for a couple reasons, if I may. Yes, Mrs. Medley was represented by an attorney in her bankruptcy proceeding. Dish did receive letters from that same attorney saying, do not contact Mrs. Medley through an ATDS. It didn't mention prerecords, that letter. But we believe that letter . . . I don't think it matters if it's from a lawyer or not. What that letter did was confirm that we can't contact her about debt that was discharged in the bankruptcy. Let's say that the letter said, I'm representing Ms. Medley in her post-discharge debt. Please do not contact her. Would the consent in the contract override that attorney contact or not? I think that that might impact the statutory counts. I don't think it would impact the TCPA count. What's pivotal to me in this case is what happened in the bankruptcy court. And if the obligation, the contract was discharged in this case, that ends any consent under the contract. Isn't that correct? Yes, Your Honor, but we believe that what was discharged was not the contract. I understand. What was discharged was any debt that Mrs. Medley owes to Dish. We cite in our brief, Tompkins v. Little Joe Records, 11th Circuit, 2007. It says rejection under Section 365, quote, has absolutely no effect upon the contract's continued existence. The contract is not canceled, repudiated, rescinded, or any other fashion terminated. So the contract, we believe, lives on. The debt, the old debt, is canceled, and the new debt starts up. And she starts with a clean slate after her bankruptcy discharge. So if I may, we just would request that the court, we think it was a very well-reasoned opinion on all counts. We request that this court affirm the district court's summary judgment opinion. Thank you for your time. If I may, Your Honors, thank you. May it please the court. Picking up on Your Honor Royal's last point, insofar as the contract doesn't disappear and disintegrate, that may be true. If there were an arbitration provision or something that wasn't a core matter, that may be able to be enforced. But to say that the TCPA, because consent was given in a contract governed by state law, somehow then overrides the bankruptcy code, a federal code that preempts the state law, and says, yeah, but since you gave consent to make auto-dialed calls, we can now continue to collect the debt that's been discharged and prohibited by the bankruptcy code, that's a core matter of the bankruptcy code. And so while the contract may not disintegrate and while there may still be some provisions of the contract that could be enforceable, anything that is an attempt to collect debt, whether it's calling by an auto-dialer, a pre-recorded voice, or sending just a good old-fashioned letter, that is prohibited. It's preempted. The bankruptcy code is clear on that, and it governs. But is that related to consent, or is that related to the fact that it's not a debt? These are consents to collect a debt. These calls are to collect the debt. The auto-dialed calls are to collect the debt. So if these were auto-dialed calls, for example, to advertise a new service that may be made and weren't under the contract, marketing, if it was an auto-dialed call and I'm being facetious to wish Ms. Medley a happy birthday, those calls aren't debt collection calls. But to the extent that they are using this technology, an auto-dialer or a pre-recorded voice, to make debt collection calls into the teeth of the bankruptcy code, which stops the very conduct that they're engaging in, consent has to be debt. Otherwise, the bankruptcy code has no effect. I mean, you're essentially carving out a way to continue to collect a debt, notwithstanding a bankruptcy discharge in an automatic state just by using an ATDS or a pre-recorded voice and because someone gave consent in a state court contract. I would offer you cannot do that. It's preempted and it violates the bankruptcy code. Lastly, they talked about it that this was somehow, and I believe this was Judge Grant's original point. It was listed in the bankruptcy schedules, and by listing it in Schedule F, I mean, I think even by counsel's argument for the appellee, the amount that was listed was termination fees, and it was termination fees that come from the contract. It was termination fees that was articulated on the telephone calls pre-petition, and so that also objectively shows DISH that this isn't an effort to continue to have a service relationship with them. They've included termination fees in Schedule F of the bankruptcy code to make sure she's eliminating her debt. Regarding Osario, and just, again, briefly talking on that again, I believe, as Judge Royal pointed out, once you have the bankruptcy and the bankruptcy discharge, and this is not two debts but one debt that's liquidated and discharged in the bankruptcy case, there really can be no calls using an auto dialer or otherwise. But focusing on Osario, counsel had argued that trying to distinguish other cases that were gratuitous. Interestingly enough, in this case, the actual contract itself says, and DISH acknowledged and agreed, and I'm quoting out of their answer brief the concept of, or I'm sorry, that you acknowledge and agree that you do not need to provide a mobile telephone number to receive these services. Anytime a contract says, hey, we'll give you the services, you can give us a cell phone number, but it's not required. A, I don't think that's bargained for consideration. I certainly don't think it's a material term to the agreement, and it's therefore should be revocable, whether or not it's under common law consent or statutory consent. That's the last point I'd like to talk about is, again, Osario very clearly said that absent restrictions to the contrary, consent can be revoked. Consent can be revoked in many ways. It can be revoked by operation of law. It can be revoked by the debtor saying, please don't call me. It can be revoked by the debtor's attorney saying, I represent her by counsel. Please communicate with me and leave her alone. All of those things would be sufficient to revoke consent, notwithstanding the bankruptcy argument. And insofar, the last thing I'll say in these last seconds is the faxes of representation that were sent not once but three times after a bankruptcy, Crystal clearly said, I still represent this woman. She's filed a bankruptcy. She wants you to leave her alone. And if you have any calls, questions, you should call me, not her. I would ask, Your Honor, that the court reversibly err by bifurcating the debt, by stating that there was a new debt that continued to be collected after the fact, that that should be vacated and judgment entered in favor of this measure. Thank you, Your Honors.